**No. 26-7304**

# In the United States Court of Appeals for the Ninth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

*v.*

STATE OF ALASKA et al.,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the District of Alaska
Case No. 26-cv-00376-SLG

## BRIEF OF FORMER MARICOPA COUNTY RECORDER STEPHEN RICHER AS AMICUS CURIAE IN SUPPORT OF MOTION FOR SUMMARY AFFIRMANCE

Kevin J. Hamilton
Jonathan P. Hawley
ASHURST PERKINS COIE US LLP
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
(206) 359-8000
Kevin.Hamilton@ashurstperkins.com
Jonathan.Hawley@ashurstperkins.com

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ ii

AMICUS CURIAE'S IDENTITY AND INTEREST ........ 1

INTRODUCTION ........ 2

ARGUMENT ........ 3

I. Addressing the recurring phenomenon of similarly named candidates falls to *state* laws, not federal law. ........ 3

II. Even where States have addressed similarly named candidates, they have done so by regulating ballot access—not by barring certification. ........ 8

III. The State of Alaska already resolved this issue before the DOJ filed suit. ........ 11

CONCLUSION ........ 15

CERTIFICATE OF SERVICE ........ 16

## TABLE OF AUTHORITIES

### Cases

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
570 U.S. 1 (2013) .......... 6

*Foster v. Love*,
522 U.S. 67 (1997) .......... 6

*Gonzales v. Madigan*,
990 F.3d 561 (7th Cir. 2021) .......... 6–8

*Jones v. Markiewicz-Qualkinbush*,
892 F.3d 935 (7th Cir. 2018) .......... 2, 14

*None of the Above v. Hardy*,
377 So. 2d 385 (La. Ct. App. 1979) (per curiam) .......... 9

*Pignanelli v. Pueblo Sch. Dist. No. 60*,
540 F.3d 1213 (10th Cir. 2008) .......... 8

*Planas v. Planas*,
937 So. 2d 745 (Fla. Dist. Ct. App. 2006) (per curiam) .......... 10

*Smith v. Cherry*,
489 F.2d 1098 (7th Cir. 1973) .......... 7

*State ex rel. Johnson v. Marsh*,
232 N.W. 104 (Neb. 1930) .......... 10

*State v. Sullivan*,
No. S-19935 (Alaska June 29, 2026) .......... 13

*Storer v. Brown*,
415 U.S. 724 (1974) .......... 13

*Sullivan v. State*,
No. 3AN-26-07485CI (Alaska Super. Ct. June 26, 2026) .......... 12–13

*U.S. Term Limits, Inc. v. Thornton*,
514 U.S. 779 (1995) .......... 13

*Wilty v. Jefferson Par. Democratic Exec. Comm.*,
157 So. 2d 718 (La. 1963) .......... 10–11

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 4, cl. 1 .......... 6

**STATUTES AND REGULATIONS**

42 U.S.C. § 1983 .......... 7

Alaska Stat. § 15.15.350 .......... 14

Fla. Stat. § 99.0215 .......... 8–9

La. Stat. Ann. § 18:463 .......... 9

Minn. Stat. § 204B.38 .......... 9

Wash. Rev. Code § 29A.84.320 .......... 8

**RULES**

Federal Rule of Appellate Procedure 29 .......... 1

**OTHER AUTHORITIES**

Charles Rabin, *Former State Senator Artiles Found Guilty of Campaign Finance and Registration Violations*, Mia. Herald (Oct. 1, 2024), https://bit.ly/4iMmVvY .......... 9

David Reamer, *A Brief History of Same-Named Political Candidates, Election Hijinks and Dan Sullivans in Alaska*, Anchorage Daily News (June 28, 2026), https://bit.ly/4iPbILe .......... 3–4

Jesse Scheckner, *Moe to Mo: Joe Saunders' Aunt Agrees to Name Change After Miami-Dade Judge's HD 106 Ruling*, Fla. Politics (Aug. 1, 2024), https://bit.ly/4zFLB0u .......... 9

John A. Farrell, *Tip O'Neill and the Democratic Century* (2001) .......... 4

Jonathan P. Hicks, *Seeing Double on Ballot: Similar Names Sow Confusion*, N.Y. Times (July 24, 2004), https://bit.ly/3WYCFVy ........ 5

Joseph Brusgard, *Candidates in 331 Races This Year Share a Last Name; up from 206 Such Races in 2024*, Ballotpedia News (Oct. 23, 2026), https://bit.ly/4zMSuNS ........ 3

Peter Nemerovski, *You Can Call Me Al: Regulating How Candidates' Names Appear on Ballots*, 99 Neb. L. Rev. 848 (2021) ........ 4–5

*Voter Registration: Hearing Before the Subcomm. on Elections of the H. Comm. on H. Admin.*, 101st Cong. (1989) ........ 1

## AMICUS CURIAE'S IDENTITY AND INTEREST

Amicus Curiae Stephen Richer was the elected Maricopa County Recorder from 2021 to 2025. In this role, he was responsible for voter registration, early-voting administration, and public records in Maricopa County, Arizona, the fourth-most-populous county in the United States. He is currently a legal fellow with the Cato Institute's Robert A. Levy Center for Constitutional Studies and a senior fellow at the Harvard Kennedy School's Ash Center for Democratic Governance and Innovation, where his work focuses on election administration, democracy, and American politics.

Given his experience and focus, Mr. Richer has a strong interest in the proper application of federal law to state and local election administration. This includes ensuring that the National Voter Registration Act of 1993 ("NVRA")—a law designed to "make[] the participation process as accessible and secure as possible" for eligible voters, *Voter Registration: Hearing Before the Subcomm. on Elections of the H. Comm. on H. Admin.*, 101st Cong. 39 (1989)—is not used by the federal government to interfere with ballot-access and election-certification processes properly left to the States.[1]

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(2) and (a)(4)(E), Mr. Richer states that all parties have consented to the filing of this brief; that no party's counsel authored the brief in whole or in part; that no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and that no person other than Mr. Richer or his counsel contributed money that was intended to fund preparing or submitting the brief.

## INTRODUCTION

"Politics," the Seventh Circuit has observed, "is a rough-and-tumble game, where hurt feelings and thwarted ambitions are a necessary part of robust debate." *Jones v. Markiewicz-Qualkinbush*, 892 F.3d 935, 939 (7th Cir. 2018). Among the age-old features of this rough-and-tumble game is the occasional presence on the ballot of a candidate with a name conspicuously similar to that of an incumbent or former officeholder. So common is the phenomenon of the similarly named candidate that it has inspired at least one major motion picture[2] and a host of court decisions and legislative enactments.

What it has *not* inspired—at least until last month—is an action filed by the U.S. Department of Justice (the "DOJ") seeking to preemptively bar certification of the winner of a federal election based on vague allegations of "voter confusion" and invocation of a voter-registration statute without even arguable application to the circumstances presented. The unprecedented nature of this case underscores its lack of merit. *State* laws, not federal law or federal courts, regulate ballot access and determine whether and when disqualification or some other remedy is appropriate. And here, Alaska's highest court already determined that Daniel J. Sullivan Jr. could appear on the ballot as a candidate for the U.S. Senate long before the DOJ filed its

---

[2] *See The Distinguished Gentleman* (Hollywood Pictures 1992).

eleventh-hour suit. The DOJ has neither standing nor a viable claim to challenge or otherwise contradict the Alaska Supreme Court's determination, and summary affirmance of the District Court's dismissal is therefore appropriate.

Based on his experience administering and analyzing the electoral process, Mr. Richer offers this brief to provide his perspective on the political issues underlying this dispute and the unprecedented nature of the federal government's intervention in Alaska's Senate election.

## ARGUMENT

### I. Addressing the recurring phenomenon of similarly named candidates falls to *state* laws, not federal law.

As the *Anchorage Daily News* observed earlier this year, "[g]aming elections in America predates independence."[3] Similarly named candidates recur in the democratic process; indeed, during this latest midterm cycle, more than *300 races* featured candidates who shared a last name.[4] This phenomenon has been especially noticeable in the Last Frontier:

> Politicians with the same or similar name [are] ancient history, nothing new to Alaskans long familiar with Begiches, Murkowskis, or the mayoral Sullivan lineage, the latter unrelated to either

[3] David Reamer, *A Brief History of Same-Named Political Candidates, Election Hijinks and Dan Sullivans in Alaska*, Anchorage Daily News (June 28, 2026), https://bit.ly/4iPbILe.

[4] Joseph Brusgard, *Candidates in 331 Races This Year Share a Last Name; up from 206 Such Races in 2024*, Ballotpedia News (Oct. 23, 2026), https://bit.ly/4zMSuNS.

> Sullivan of current interest. Viola Sullivan was mayor of Valdez. Her son, George, was mayor of Anchorage. His son, the third Dan mentioned above, was later mayor of Anchorage. In the 1980s, there were two Mike Millers in the Legislature, though from different districts.[5]

The presence of similarly or identically named candidates is not, of course, always the product of coincidence or dynastic happenstance; "[s]ome candidates have tried to capitalize on similarities between their names and those of well-known candidates or politicians."[6] The annals of political *and* legal history abound with such stories. When future Speaker of the House Tip O'Neill first ran for Congress in 1952—an election to succeed John F. Kennedy, who was then running for the Senate—he initially faced "[a] candidate who might have killed [his] hopes," "an opportunistic nobody with the same name as John F. Kennedy."[7] The other John F. Kennedy was eventually persuaded to abandon the race.[8] A half-century later, "José E. Serrano encountered a slight impediment on the way to being re-elected to Congress from the Bronx. It was Jose Serrano, an unemployed former loading dock-

---

[5] Reamer, *supra* note 3.

[6] Peter Nemerovski, *You Can Call Me Al: Regulating How Candidates' Names Appear on Ballots*, 99 Neb. L. Rev. 848, 870 (2021).

[7] John A. Farrell, *Tip O'Neill and the Democratic Century* 123 (2001).

[8] *Id.*

worker with the same name, who had decided that he, too, wanted the Congressional seat."[9] Mr. Serrano "aborted his nascent political career … after being questioned by a reporter."[10] More recently,

> [i]n 2015, a thirty-three-year-old Texas law student filed paperwork to run for U.S. Representative in Texas's 15th Congressional District under the name Ruben Ramirez Hinojosa. At the time, the district had been represented by a different Ruben Hinojosa since 1997; Representative Hinojosa was not seeking reelection. Party officials were understandably concerned that voters would mistake Ramirez Hinojosa for the retiring congressman....
>
> After much back-and-forth with state party officials, the party decided that Ramirez Hinojosa would appear on the ballot as Ruben Ramirez.[11]

These historical examples demonstrate that the risk of confusion or unfairness caused by similarly named candidates is sometimes mitigated through nonlegal channels, like appeals to party organizations or negotiations with the candidates themselves. Other times, they are resolved through the democratic process: Similarly named candidates appear on the ballot together and voters are left to decide between them. But significantly, when legal levers have been pulled instead and the judiciary has been called on to address this issue, it has fallen within the exclusive province of *state* courts under *state* laws.

---

[9] Jonathan P. Hicks, *Seeing Double on Ballot: Similar Names Sow Confusion*, N.Y. Times (July 24, 2004), https://bit.ly/3WYCFVy.

[10] *Id.*

[11] Nemerovski, *supra* note 6, at 872 (footnotes omitted).

As a doctrinal matter, this reliance on state-law remedies is unsurprising: The U.S. Constitution provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." U.S. Const. art. I, § 4, cl. 1. Though "Congress may at any time by Law make or alter such Regulations," *id.*, the Elections "Clause's substantive scope is broad.... '[I]t invests the States with responsibility for the mechanics of congressional elections ... so far as Congress declines to pre-empt state legislative choices.'" *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8–9 (2013) (quoting *Foster v. Love*, 522 U.S. 67, 69 (1997)).

Here, Congress has *not* legislated the issue of identically or similarly named candidates, least of all in the manner proposed by the DOJ in this case. Certainly the NVRA—the only federal law cited in the complaint—does not regulate ballot access, ballot counting, or certification procedures. Instead, whether and how to address the potential for confusion caused by candidates' names is left for States to decide for themselves.

Indeed, federal courts have *rejected* calls to police this particular strain of political gamesmanship given the absence of a clear doctrinal basis for their intervention. In *Gonzales v. Madigan*, "[f]our candidates were on the ballot for [a] Democratic primary in spring 2016: Michael Madigan, Jason Gonzales, Grasiela Rodriguez, and Joe G. Barboza. Madigan won with 65%

of the votes cast; Gonzales received 27%, Rodriguez 6%, and Barboza 2%." 990 F.3d 561, 563 (7th Cir. 2021). The plaintiff, Gonzales, claimed "under 42 U.S.C. § 1983 that Rodriguez and Barboza were stooges put on the ballot by Madigan's allies to divide the Hispanic vote and ensure Madigan's victory," based in part on Seventh Circuit precedent that "held that a stalking-horse candidacy, in which the nominal contestant secretly planned to withdraw after winning the primary and permit a party committee to name the candidate for the general election, could in principle violate the Equal Protection Clause." *Id.* (citing *Smith v. Cherry*, 489 F.2d 1098 (7th Cir. 1973)). Rejecting Gonzales's claims, the Seventh Circuit took the opportunity to question its prior holding and comment on the broader question of judicial intervention:

> The opinion in *Smith* does not explain *why* political deceit violates the Equal Protection Clause. We mean no disrespect to politicians in recognizing that many false statements are made during political campaigns and that many a stratagem that one side deems clever will be seen by the opposition as a dirty trick. Opposing political figures may brand true statements as false and honest campaigning as a rotten subterfuge. Voters rather than judges must decide when one side has gone overboard....
>
> *Smith* was a bolt from the blue. It does not have any predecessors that we could find. Nor has it had any successors.... As far as we can tell, none of the other courts of appeals has ever reached a decision similar to *Smith*; certainly none has ever relied on *Smith*

> to vindicate one politician's view that an opponent overstepped the bounds of propriety.

*Id.* at 564–65 (citing *Pignanelli v. Pueblo Sch. Dist. No. 60*, 540 F.3d 1213, 1219 (10th Cir. 2008)). Absent a viable legal theory, the DOJ's request for judicial intervention in this case likewise fails as a matter of policy as well as a matter of federalism.

## II. Even where States have addressed similarly named candidates, they have done so by regulating ballot access—not by barring certification.

Unlike Congress, States have adopted various methods of addressing similarly named candidates.

Under Washington law, for example, it is a felony to file a declaration of candidacy using either "[a] name similar to that of an incumbent seeking reelection to the same office with intent to confuse and mislead the electors by taking advantage of the public reputation of the incumbent" or "[a] surname similar to one who has already filed for the same office, and whose political reputation is widely known, with intent to confuse and mislead the electors by capitalizing on the public reputation of the candidate who had previously filed." Wash. Rev. Code § 29A.84.320. Some States prohibit the use of deceptive candidate names, *see, e.g.*, Fla. Stat. § 99.0215(2) (allowing use of nicknames on ballots but specifying that "[a]ny nickname designated by a candidate may not be used to mislead voters" and "[a] candidate may

not designate a nickname that implies the candidate is some other person");[12] La. Stat. Ann. § 18:463(A)(1)(b) ("The candidate … shall not designate a title, designation, or deceptive name[.]"),[13] while other States allow for the addition of clarifying language on the ballot, *see, e.g.*, Minn. Stat. § 204B.38 ("When the similarity of both the first and last names of two or more candidates for the same office at the same election may cause confusion to voters, up to three additional words may be printed on the ballot after each surname to indicate the candidate's occupation, office, residence or any combination of them[.]").

---

[12] *See* Jesse Scheckner, *Moe to Mo: Joe Saunders' Aunt Agrees to Name Change After Miami-Dade Judge's HD 106 Ruling*, Fla. Politics (Aug. 1, 2024), https://bit.ly/4zFLB0u (describing case where nickname statute was at issue). Florida also provides an example of alternative means of addressing this issue: prohibiting ancillary activities that facilitate sham candidacies. Recently, a former state legislator "was found guilty of excessive campaign contributions, conspiracy to commit excessive contributions and falsely swearing an oath" in connection with a "ghost candidate" scheme. Charles Rabin, *Former State Senator Artiles Found Guilty of Campaign Finance and Registration Violations*, Mia. Herald (Oct. 1, 2024), https://bit.ly/4iMmVvY.

[13] For a particularly memorable application of this statute, see *None of the Above v. Hardy*, 377 So. 2d 385, 386 (La. Ct. App. 1979) (per curiam) ("Petitioner qualified to run for Governor of the State of Louisiana under the name of Luther Devine 'L.D.' Knox and requested his name to appear on the ballot in that form. A month after the qualifying period he legally changed his name to None-Of-The-Above. He then requested the Secretary of State to change his name on the ballot.").

Additionally, state courts have at times regulated ballot access and addressed similarly named candidates based on their inherent power to combat "fraudulent conduct which is purposefully done to foul the election or corrupt the ballot." *Planas v. Planas*, 937 So. 2d 745, 746 (Fla. Dist. Ct. App. 2006) (per curiam) (citation modified); *see Wilty v. Jefferson Par. Democratic Exec. Comm.*, 157 So. 2d 718, 725–26 (La. 1963) (exercising inherent authority to ensure "a fair election .... where there is [no] circumstance which confuses (or seriously tends to confuse) the voter as to the identity of the candidates").[14] Their chosen methods have varied. Sometimes, for instance, a candidate is outright disqualified from the ballot. *See, e.g.*, *Planas*, 937 So. 2d at 746 (affirming disqualification of similarly named candidate who "designat[ed] a name … which had not been adopted by him and under which he had not transacted private and official business" and thus "did not act in the good faith and honest purpose" (citation modified)); *State ex rel. Johnson v. Marsh*, 232 N.W. 104, 104 (Neb. 1930) (explaining that "we have the power to exclude from the list of candidates one who has so falsely misrepresented his name in the circumstances here found" and affirming secretary of state's decision to exclude "Fred Johnson," who "was not intending to be a good faith candidate … but to confuse his name with that of Fred H. Johnson, a good faith candidate"). Other times, a candidate

[14] *Wilty* pre-dated enactment of Louisiana's deceptive-name law.

is required to appear on the ballot with a less-confusing monicker. *See, e.g.*, *Wilty*, 157 So. 2d at 726 (sustaining objection of incumbent parish assessor, Vernon J. Wilty, Jr., to candidacy of his wife "under the name of Mrs. Vernon J. Wilty, Jr." and requiring that she appear on ballot "under the name of Mrs. Laura Verret Wilty").

Although judicial intervention in these cases has not been without controversy, *see, e.g.*, *Wilty*, 157 So. 2d at 727 (Hawthorne, J., dissenting) ("This case properly belongs to the political department of the government, as there is no statute or constitutional provision giving the judiciary the power to act in a case like this."), it is significant not only that these cases were decided by state courts but also that they arose *at the ballot-access stage*, not on the eve of an election or at certification. This approach is intuitive: Once an election is concluded, it is no longer feasible for a court—*any* court—to determine why voters might have voted for one candidate instead of another, be it confusion or some other reason entirely. Where state laws provide a remedy to counteract the confusion caused by similarly named candidates, they do so proactively, making determinations before voters even receive their ballots—and certainly before voting has commenced.

## III. The State of Alaska already resolved this issue before the DOJ filed suit.

Ultimately, whether to provide a remedy to a candidate or party in cases like this is left to each State's discretion. Consistent with the federalist

underpinnings of congressional elections, a State can choose to proactively combat voter confusion—or not. And here, the State of Alaska already made its decision.

On May 29, 2026, Daniel J. Sullivan Jr.—Mr. Sullivan—"filed his notarized declaration of candidacy for the office of U.S. Senator with the" Division of Elections (the "Division"). Order on Administrative Appeal at 2, *Sullivan v. State*, No. 3AN-26-07485CI (Alaska Super. Ct. June 26, 2026). Following an investigation (prompted by a letter from the National Republican Senatorial Committee) and the filing of two candidate-eligibility complaints by the chair of the Alaska Republican Party, the Division issued a "final determination regarding Mr. Sullivan's eligibility for office," finding that his "declaration of candidacy was not properly filed because it was not filed in order to declare an actual good-faith candidacy for the office of the United States Senator." *Id.* at 3–5 (citation modified). The Division determined "that Mr. Sullivan's declaration was instead filed with a purpose to confuse or mislead and to thereby compromise the ballot's fairness or neutrality." *Id.* at 5 (citation modified). Mr. Sullivan appealed the Division's determination to the Anchorage Superior Court, which concluded that

> the Division's decision to exclude Mr. Sullivan from the primary ballot because it determined his declaration was not filed in order to declare an actual good-faith candidacy for the office of United States Senator was not based upon the constitutional

> requirements of Article I, § 3,[15] the Alaska statutes governing elections, or regulations promulgated by the Division. Instead, the decision was based upon a new, previously unstated, "good-faith" criteria. In addition, the Director's assertion that Mr. Sullivan seeks to confuse or misguide voters is not supported by a preponderance of evidence. Instead, the Division accepted at face-value the assertions of the complaint, and disregarded Mr. Sullivan's assertions.

*Id.* at 31 (citation modified). The court thus declared "Mr. Dan J. Sullivan … to be an eligible candidate for the office of United States Senator." *Id.* The Alaska Supreme Court affirmed in an order dated three days later, remanding the case to the Division "to determine, in the first instance, how [Mr.] Sullivan shall be listed as a candidate within the confines of existing Alaska ballot design law." Order at 1, *State v. Sullivan*, No. S-19935 (Alaska June 29, 2026). The Division addressed the situation by adding the word "Incumbent" next to Senator Dan S. Sullivan's "(Registered Republican)" designation and listing Mr. Sullivan without any party affiliation, *see*

---

[15] "[T]he Framers intended the Constitution to be the exclusive source of qualifications for Members of Congress," and neither States nor Congress may alter the qualifications enumerated in Article I, Section 3 or impose additional qualifications. *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 798, 800–01 (1995) (constitutional qualifications for members of Congress are "fixed"). Candidates may be otherwise disqualified from the ballot only where neutral, prospectively enacted rules prescribe particular rules. *See Storer v. Brown*, 415 U.S. 724, 734–36 (1974).

Dkt. 10.1 at 6–7—accommodations that reflect what other States have elected to do to disambiguate similarly named candidates, *see supra* pp. 8–9.[16]

The case of the two Dan Sullivans thus played out consistent with historical practice and constitutional imperative. Mr. Sullivan's access to the ballot was scrutinized by the state government and litigated in state court. An Alaska trial court, affirmed by the Alaska Supreme Court, concluded that Alaska law does not provide a legal basis for blocking Mr. Sullivan from the ballot. The machinery of state election law operated as designed. There is no basis for the federal government to challenge that result—or for a federal court to circumvent it.

* * *

As the Seventh Circuit opined, "[t]he price of political dirty tricks must be collected at the ballot box rather than the courthouse." *Jones*, 892 F.3d at 939–40. Federal courts are not empowered to micromanage a State's ballot-access decisions (or second-guess a state supreme court's interpretation of state law) without firm constitutional or statutory footing. Here, the DOJ's complaint identifies no viable legal basis for its extraordinary request to block certification of a winning Senate candidate. The issue of Mr. Sullivan's

[16] Alaska's electoral system includes another mechanism that mitigated any confusion: ranked-choice voting. *See* Alaska Stat. § 15.15.350. If a voter could not distinguish between the two Sullivans and ranked them first and second, then, regardless of the precise ordering, those votes will be aggregated in the event no candidate receives a majority of votes.

candidacy has already been addressed as a matter of Alaska law. That is enough to end this case.

## CONCLUSION

This Court should summarily affirm the District Court's dismissal.

Respectfully submitted this 13th day of November, 2026.

*s/ Kevin J. Hamilton*
Kevin J. Hamilton
Jonathan P. Hawley
ASHURST PERKINS COIE US LLP
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
(206) 359-8000
Kevin.Hamilton@ashurstperkins.com
Jonathan.Hawley@ashurstperkins.com

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the attached document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system on November 13, 2026.

*s/ Kevin J. Hamilton*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-7304

I am the attorney or self-represented party.

**This brief contains** 3,446 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- ○ complies with the word limit of Cir. R. 32-1.
- ○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ● is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - ☐ it is a joint brief submitted by separately represented parties.
  - ☐ a party or parties are filing a single brief in response to multiple briefs.
  - ☐ a party or parties are filing a single brief in response to a longer joint brief.
- ○ complies with the length limit designated by court order dated ________.
- ○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Kevin J. Hamilton **Date** 11/13/2026

*(use "s/[typed name]" to sign electronically-filed documents)*